## PLITT *v.* GRIM

[No. 45, September Term, 1959.]

*Decided November 19, 1959.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Eugene P. Smith,* with whom were *M. William Adelson, John G. Arthur, Jr.* and *Benjamin Swogell* on the brief, for appellant.

*L. Robert Evans,* for appellee.

HAMMOND, J., delivered the opinion of the Court.

Plitt, a money lender, sued Grim as the indorser of a negotiable promissory note after he had been unable to collect anything on a judgment against the makers for $2,207. The trial judge, sitting without a jury, found that no notice of dishonor had been given Grim and entered judgment in his favor.

In 1957 Grim, who operated a bookkeeping and tax service agency, was acting as bookkeeper and fiscal adviser to Leroy Walton and Mary Taylor, who conducted the Wal-Tay Nursing Home. The landlord and the finance company were dunning it, and the Health Department was insisting on repairs and fireproofing if it was to have its license.

In January and April Grim got extensions from the landlord, and in February he arranged to defer payments to the finance company due on the deep freeze. In March Grim arranged with Plitt to lend $4,500 to Wal-Tay. Plitt says Grim came to him with a note for $6,150, payable to Grim and signed by Walton and Taylor, which Grim told him had been given him for services rendered and money advanced, and that he bought the note from Grim for $4,500.

On the other hand, Grim says Wal-Tay was very short of money, could not meet its monthly payments, and that "things were getting desperate" at the time he told them of Plitt, who had lent money to other clients of his. Plitt was willing to lend $4,500 for a bonus of $1,500 and $150.00 interest paid in advance (6% on $6,000 for five months) on a note for $6,150 payable in five monthly installments, but he told Grim that since Wal-Tay was not a corporation, usury laws were a problem and, therefore, the note would have to be payable to Grim and be indorsed by him to Plitt. The trial judge found, correctly, we think, that Grim's version was the true one.

As a result of Plitt's demand for arrangements that would provide usurious interest, Walton and Taylor signed the note sued on, dated March 14, 1957, and payable to Grim in the amount of $6,150 at his home address "in installments (5) of $1,230 each after date." Grim indorsed the note and delivered it to Plitt, together with five post-dated checks signed for Wal-Tay by Walton and Taylor, payable to Grim and indorsed by him, each for $1,230. The checks were payable a month apart, beginning April 12, 1957. In return Plitt paid Grim $4,500 in three checks of $2,500, $1,200, and $800, and the proceeds of the checks were turned over to Wal-Tay.

Grim took a chattel mortgage for $4,500 from Walton and Taylor and their respective spouses, dated the same day as the note but actually executed some days later, covering furniture and equipment in the nursing home and in the homes of the mortgagors. From the all-inclusive nature of the articles conveyed by the mortgage (for example, a living room lamp), and the joinder of the spouses in the mortgage, it would appear that the mortgage covered all the tangible property of the mortgagors. Plitt knew that Grim had taken the chattel mortgage. About a year after giving the note, Wal-Tay went out of business for lack of funds.

The check dated April 12 for $1,230 was returned to Plitt because the bank account of Wal-Tay had been closed. Grim and Plitt then knew, of course, as they testified, that the other four checks would not be cashable. Several days after the check had been returned, either Walton or Taylor brought in to Plitt checks of the Department of Welfare that had been given Wal-Tay for caring for welfare patients, sufficient to pay the $1,230 due. When the May 14 installment of $1,230 became due, Wal-Tay paid $530 by the application of welfare checks in that amount, and Plitt extended payment of the remaining $700 from May 12 to June 12 in consideration of the payment to him of a bonus of 10%, or $70.00. On May 13, Grim wrote Plitt a letter—he says, and Plitt denies, that Plitt dictated it over the telephone—making an offer to pay another $70.00 for a further extension to October 12, 1957, and to pay the other installments of $1,230 each "in accordance with their due dates." It is agreed that Plitt would not

accept the offer and, although it is not entirely clear, the testimony indicates that on June 12 Grim, Walton and Taylor went to Plitt with the $700 due on the May 12 installment, and on July 3 Walton and Taylor paid Plitt $123 for an extension to July 12 of the $1,230 due on June 12. The same procedure was followed as to the installment due on July 12.

Grim testified that the last contact he had with Plitt was at the time of the letter, although he also said in reply to the suggestion that he had testified in the suit against the makers that he had paid the $700 to Plitt in June, that if he so testified it was the truth. He went on to testify that at the time of the letter (May 13) he knew that Wal-Tay was unable to pay the installments as they came due "but we evidently assumed we made satisfactory arrangements to pay the note." He was asked if this was by having arranged to extend the installments, and his answer was: "By extending them—that the extensions would keep coming as long as we could, until we got on our feet" and that those extensions were to cost $123 a month.

Testimony that the note was to be payable in five consecutive monthly installments on the dates of the five checks came in without objection, and the parties have tried the case on the premise that this was the agreement. They also agree that the primarily decisive question in the case is whether Grim waived his right to be given notice of the dishonor of any installment not paid when due by Wal-Tay.

The trial judge found as facts (a) that the last contact Grim had with Plitt was at the time of the letter of May 13, and (b) that Grim had no knowledge of presentments as to installments due after May. Assuming the findings to have been correct, we think they were not dispositive of the case, for if Grim had waived the right to be given notice of dishonor of the installments becoming due after May 12, whether he had had further contact with Plitt or whether he knew presentments had, or had not, been made, would not necessarily have been decisive.

Code (1957), Art. 13, sec. 130, provides that "[n]otice of dishonor may be waived, either before the time of giving notice has arrived, or after the omission to give due notice, and

the waiver may be express or implied." (Sec. 103 has similar provisions as to presentment.) Section 130 is declaratory of the common law. *Linthicum v. Bagby,* 131 Md. 644, 646. In that case the indorser, over a period of years, had indorsed blank renewal notes and given them to the maker to fill out and deliver to the holder, and it was held that the long course of conduct permitted the inference that there had been a waiver, that the indorser intended to place her credit continuously at the maker's disposal, with full assumption of such liability as might be incurred, and that necessity of notice of dishonor had thus been obviated. The Court said: "A waiver of notice of dishonor may be implied by any conduct or words of the indorser by which the holder of the note is reasonably induced to believe that such waiver was intended", and cited authority to the effect that usage, words or acts which by fair and reasonable construction are of such a character as will satisfy the mind that a waiver was intended, or which will justify the holder in assuming that the indorser intended to dispense with notice, will permit a finding of waiver.

In *Leonard v. Union Trust Company,* 140 Md. 192, the bank sued Leonard, the president of the corporate maker, who had individually indorsed the note to the bank. The bank filed a petition against the corporation in the bankruptcy court in 1917 and filed its claim on the note, and in 1919 received a small dividend. In 1920 the bank presented the note for payment and it was protested and notice sent Leonard as indorser. Leonard had conferred frequently with the officers of the bank after 1917 in an effort to reorganize the corporate maker and the bank officers said they had not desired to press him, but rather to help him reorganize so that the corporation's indebtedness, including the balance due on the note, could be paid. The Court said: "Under these circumstances we think the note was presented, and notice of dishonor given to the defendant, within a reasonable time * * * and that there was evidence from which the jury could have found that the defendant acquiesced in, and waived any right he would otherwise have had by reason of, such delay," and held that Leonard's prayers instructing to the contrary properly were rejected. Similar conclusions were reached in

similar situations in *Whitney v. Chadsey* (Mich.), 185 N. W. 826, 828, and *Baumeister v. Kuntz* (Fla.), 42 So. 886, 888.

Waiver of presentment and of notice of dishonor by an indorser often have been inferred by the Courts from acquiescence, express or implied, in extension of the time for payment of the note. In *Rhoads v. National Bank,* 172 Md. 123, 127, the Court found the express waiver of notice on the note applicable to the indorser and said: "It is a well-supported view that consent by an indorser of a note to extension of the time of payment is of itself sufficient to indicate that presentment and notice of dishonor have been waived," and after referring to the *Linthicum* case *(supra)* as authority for the proposition that waiver may be inferred from conduct or words that may reasonably induce the holder of the note to believe that such waiver was intended, concluded: "There is adequate reason to infer an intention to waive presentment and notice from the terms of appellant's indorsement." There is general agreement with the propositions approved in the *Rhoads* case.[1]

This Court has said that a transfer to an indorser of a note by way of mortgage of all the property of the maker, to indemnify him against loss for his liability as indorser, exempts the holder from the necessity of making or proving demand. In *Brandt v. Mickle,* 28 Md. 436, 448, it is said that the authorities referred to in *Duvall v. Farmers Bank,* 9 G. & J. 31 (which adopted as the law of Maryland the view the Courts of Massachusetts, Connecticut and Pennsylvania had taken, although finding it inapplicable on the facts) showed the reasons for the rule to be (a) that the indorser,

---

1. Cases of written agreement to extension include *Amoskeag Bank v. Moore,* 37 N. H. 539, 75 Am. Dec. 156; *Ridgway & Budd v. Day,* 13 Pa. 208; *First National Bank of Henderson v. Johnson* (N. C.), 86 S. E. 360, 362. Cases where the agreement to extend was oral or implied include: *Fuller v. McDonald* (Me.), 8 Greenleaf 213, 220; *Sheldon v. Horton,* 43 N. Y. 93; *Glaze v. Ferguson* (Kan.), 29 P. 396; *McMonigal v. Brown* (Ohio), 15 N. E. 860; *Gove v. Vining* (Mass.), 7 Met. 212; *Cady v. Bradshaw* (N. Y.), 22 N. E. 371; *Foundry Mfg. Co. v. Farr* (Vt.), 119 A. 885; *Moll v. Roth Co.* (Ore.), 152 P. 235.

having secured himself as fully as may be, must be considered as having waived the notice as a condition of liability, and (b) that since the indorser has stripped the maker, he must know a demand upon the maker would be fruitless.

We find the record almost to compel the inference that Grim waived presentment and notice of dishonor. Although it has been held that, standing alone, the indorser's knowledge of the maker's insolvency will not excuse the giving of notice of dishonor, there is more here. Plitt and Grim knew of Wal-Tay's almost desperate financial straits at the time of the making of the note. A month later, they knew that the bank account had been closed, that the four remaining checks would never be presented for payment, and that Wal-Tay was using almost all of its income, in the form of Welfare Department checks, to pay the first installment, due April 12. Plitt and Grim knew, two months after the date of the note, that the same procedure was followed except that the amount of the welfare checks was less and a cash bonus of ten per cent was paid for the extension of time of payment of the amount still owed after the application of the welfare checks on the second installment, due May 12. Grim participated in this extension arrangement. Grim himself says that at the time of the arranging for the extension of payment of the second installment "we" [2] had made arrangements to keep on extending the times of payments of the checks until "we" got on our feet by the payment of ten per cent of the amount extended, (or $123 a month if no payment on principal was made). That such arrangements had been made is confirmed by the extensions later made for the bonus of $123 a month. Plitt knew Grim had taken a chattel mortgage of all the maker's property as security.

We conclude that the record shows (a) that Grim did not expect that the June, July and August installments of $1,230 each would be paid when due; (b) that he helped arrange,

---

2. In his testimony Grim consistently used the pronoun "we" in referring to his activities in behalf of, and his connection with, Wal-Tay; clearly, he thought of himself as part of the organization.

and agreed to, their extension; and (c) that Plitt knew this. Without considering the taking and retaining of the chattel mortgage as a ground of decision, we find Grim's conduct was such as to fairly and reasonably have justified Plitt in assuming that he did not expect nor desire presentment or notice of dishonor.

Presentment and notice of dishonor were not required, under the circumstances, as a condition precedent to Grim's liability on his indorsement.

*Judgment reversed, with costs.*